324-0482 Camille Kordas, Appellant v. Bob's All Bright Electric, Inc.  Risvold, if you are ready to proceed. I am, Your Honor. May it please the Court. My name is John Risvold. I represent the plaintiff and appellant Camille Kordas. We ask the Court to reverse the trial court's order granting summary judgment in favor of defendant Bob's All Bright Electric, Inc. and to remand the case for a jury to decide the facts in controversy. Your Honors, this case is not about a workplace accident. It's about an employer and a father, Robert Clarizio, who knew that their employee and son, Thomas Clarizio, was violently mentally ill. Is that played out in the record? Certainly there is a question of fact as to whether or not they knew that he was mentally ill. The defendant, the son, said that he told his father that his father was aware, but the father denies that in his deposition. But was there ever any talk of the father knowing that he was violent? Yes, there's prior history where Thomas and another employee before Camille had been working with him, they had got, Thomas had gotten into an argument with one of their longtime customers who was a flower, you know, a flower shop in the city and had been hostile and aggressive towards the owner of that shop such that they lost business from it. And his brother, Thomas's brother, had to separate the two and sort of break it up. And that was known to everybody except for my client. Similarly, Robert Clarizio knew that his son had been involuntarily hospitalized due to mental illness because he was a danger to himself and others. And really, the only way you can become involuntarily hospitalized in Illinois is because you're a danger to yourself and others. And Robert certainly was aware. Or others, counsel, I just wanted to be clear. Yes, Your Honor. I'm sorry if I'm breaking up a little bit. Yes, yourself and others. No, I was disagreeing with you. I said, or others, not both. I'm sorry. But we'll let you keep going. I appreciate it. The exclusive remedy provision of the Illinois Workers' Comp Act doesn't apply because Bob's conduct was an intentional concealment. It's not an accident. So the Workers' Compensation Act does bar common law claims for only accidental injuries that arise out of the course of employment. But here, the employer intentionally concealed a known danger, the violent and unstable mental health condition of Thomas Clarizio. Bob's Ball Bright Electric knew that Thomas had been involuntarily hospitalized, had refused medication, and had at least one episode that was known of a violent tendency or violent past. They placed him unsupervised with Mr. Cordes. It's a foreseeable risk of a serious injury. If you look to Handley and Daniels, the concealment is quite similar. The only difference really between the Daniels case and this case is that in Daniels, we're dealing with asbestos. And in this case, we're dealing with an employee who is schizophrenic and unmedicated and has been hospitalized and has a violent past. And that plays itself out as well in the police report and the admissions of Thomas Clarizio, that he was seeing visions, that he was seeing things and hearing things. He was having auditory and visual hallucinations, but that he wanted to kill Camille Cordes. The appellee, the defendant, relies heavily on Miraberry to say that basically the case is not one that involves intentional concealment. I think Daniels is what controls, not Miraberry. And under Daniels, the employer's concealment of the danger is what's actionable at common law. The injury itself was personal and it was foreseeable, and it wasn't a risk inherent in the employment. This isn't a situation where an electrician fell through or fell from scaffolding. It's a situation where an electrician, my client, is on his knees working on a panel in the garage and he is attacked from behind with a shovel by a violent co-employee. The only person besides Thomas Clarizio that had knowledge that there was any potential danger was his father and the owner of the company, Robert Clarizio. And Clarizio, Thomas Clarizio, told the police that he felt bad that he hadn't killed Camille, that Camille wasn't dead, that he had tried to kill him and that he hated him. This isn't a dispute of the like that it can be considered an accident. It's attempted harm or attempted murder, really, fueled by concealed longstanding instability of Thomas Clarizio and an animosity that he had either imagined in his head because he's not medicated and he's seeing and hearing things, or that he believed genuinely that Camille in some way had animosity towards him. It's more akin to a personal dispute than it is to any sort of accident. When an employer, though, puts a known potentially violent, mentally ill person in a position of power like this, relatively unsupervised, and someone gets hurt, that's not a work injury. It's employer misconduct. Really, the danger here is that effectively, Bob's put a ticking time bomb in the workplace, didn't tell anybody that it was there, didn't know when it might go off. When my client was least suspecting it and with no knowledge whatsoever, and while he was completely vulnerable, the bomb went off and he was attacked. Mr. Roosevelt, you've already answered this question with reference to the flower shop. When we come back, or actually when Ms. Coyle is giving her argument, I would ask that you give me a cite for that from the record of that information. That was not my understanding, but you would agree that just mental illness alone without some evidence of acting out violently wouldn't be enough? I would agree with you that simple mental illness, a diagnosis, is certainly not enough. A large majority of the population, by the definitions of the DSM-5, have, to some degree, a mental illness. What about schizophrenia? Schizophrenia, unmedicated, if it's something that Robert's aware of, which in this case, he was aware that Thomas wasn't taking his medication and aware of the involuntary hospitalization, that is when it rises to a level of concealment. Is there any evidence that he's aware of the diagnosis? I'm not certain that there's an official diagnosis until Thomas was deposed. That's the first that I learned of schizophrenia. I don't have any medical records for Thomas. His father was aware that he had been involuntarily hospitalized and that he wasn't taking medication and that he had been prescribed medication. All of that is in the deposition of Robert. But you would agree that it's the knowledge of violently acting out that's the most important? I would say it's the danger of violently acting out that is most important. Similarly, in Daniels, it's not that asbestos exists, it's that asbestos inhalation can cause cancer and that it is a danger. It is a hazard. It's not that he has exhibited repeated violent behavior. It's that he has a tendency to be hostile or a tendency to be violent or may be violent, and nobody else knows. If Camille had been warned, if he had been told that you need to keep an eye on Thomas because he's coming out of the hospital a couple of weeks ago, he'd been involuntarily hospitalized. I want you to keep a close eye on him and make sure that he's staying on task. He's doing all right. And if anything looks or feels off to you, call me and let me know. That's a different scenario. But here, it's sort of swept under the rug. I mean, not sort of, it really is swept under the rug. And nobody tells my client that there is this danger. And part of that plays out in the aftermath of the attack. The, Robert goes back to the site, the job site and collects the shovel that was used to attack Camille. He goes back to the site to sort of clean up the scene of the crime and sort of cover it up to try to protect his son. And I understand a father trying to protect his son, but an employer has an obligation to also protect their employees from known potential dangers and hazards. And that's what Handley, and that's what Daniels repeatedly reemphasizes is that you have an affirmative obligation as an employer to let your employees know that there is a hazard on the workplace. And just because the hazard in that case was asbestos and not a dangerous employee, it's a distinction without a difference. As it pertains to the exclusive remedy provision, it's not intended to protect employers who conceal known dangers or enable for stable violence. In fact, it's specifically carves out intentional acts. It specifically carves out these types of coverups. And in this case, my client is sent into the dangerous situation completely blind. He has no way to guard against it. He has no way of knowing that he's going to be in a situation that is dangerous. Even in Daniels, specifically Daniels, even in Daniels where the employees are working with products that look like or feel like or seem like asbestos, they have at least some imputed knowledge that asbestos is dangerous. He or Camille has no idea that his coworker could at any point in time hallucinate auditorily or visually or could fly off the handle violently or be hostile. There's no way for him to protect himself or guard himself against that danger. The only way for him to have done that would be for his employer who has that specific knowledge to warn him that his fellow employee is dangerous or potentially dangerous. And for those reasons, we would ask the court reverse the summary judgment ruling of the trial court and remand for trial. There are, in our opinion, several issues of material fact for a jury to resolve, specifically the degree of knowledge that the employer had and whether or not the concealment was intentional. Thank you, Mr. Risvo. Justice Anderson? I don't think there's any question that they knew he was, that he had some mental health problems. I'm sorry, I'm still not clear on whether they knew that he was potentially dangerous and could, and I think you discussed, sorry, but can you point to me specifically where the evidence where the evidence would suggest that they knew he was dangerous? Certainly the involuntary hospitalizations. It's not that he's hospitalized once or twice. It's four times and it's four times in a single year. So you have a situation where an individual is repeatedly a danger to themselves or others and they are put into treatment against their will. That is all knowledge that Robert had, both as the father of Thomas and his employer. And it's knowledge that Camille did not have. He didn't know that Thomas had been hospitalized for any dangerous propensities. I don't think it's an unfair inference that he might have been dangerous to himself and that's why he was hospitalized. But was there anything in the record involving specific instances where he struck someone, that he threatened to hurt someone? Anything like that? Yeah, the incident that I'm referring to with the flower shop, and I'll have to find the citation because I don't off the top of my head have it and I will get it for you. And I apologize for not having it off the top of my head. But that incident stands out to me. There's also discussion in the record, in the depositions of Thomas and his brothers being hostile towards one another or aggressive towards one another. But I don't have a specific example where Thomas had attacked someone in the past which, again, I think lends itself to the idea that Camille had no idea or no way to know or believe that Thomas would be dangerous or violent. He has no way of knowing. He hasn't even heard a rumor or anything secondhand from somebody else at the shop or another job site or a client that says, hey, last time we were here, Thomas was pretty off. He was pretty violent. He was pretty angry. He was hostile. None of that exists. The only person with knowledge in this case is the owner of the company. And it's unique in the sense that we're not talking about Boeing where employee 5,321 might have a dangerous propensity and the CEO of the major corporation doesn't know or does know and doesn't tell everybody in the company. That's a totally different scenario. Here, it's a three, at the time, three-person company. Two of the people are father and son. And that father is aware that the son has been involuntarily hospitalized due to dangerous propensities. Thank you, Mr. Roosevelt. We'll let you look for that site while Ms. Coyle takes over her argument. Good afternoon, and may you please support. My name is Brittany Coyle. I represent the appellee defendant, Bob Albright-Electric, who was the plaintiff's employer at the time of this occurrence. The heart of the issue in this matter is whether the plaintiff has established that his civil claims fall within one of the four exceptions to the exclusive remedy provision of the Illinois Workers' Compensation Act. The short answer is no, and the plaintiff's recovery is limited to count. Accordingly, the trial court properly granted the defendant's motion for summary judgment as to counts 1 through 3 of the complaint. Ms. Coyle, I hate to interrupt you, but I'm having a little difficulty. I want to communicate with Justice Anderson. Justice Anderson, can you hear okay? I can make out what she's saying. I mean, I do agree. It sounds like she's in a tin can, but I can follow. And that may be, in this case, I think maybe being too close as opposed to, it's usually being too far away. But Ms. Coyle, what do you think? If I hear your response, maybe I'll know. Sure. Is this better? I'm backing up a little bit. Actually, it does seem better. I don't know if you're also... Okay, I was trying to get closer to the mic, but it... Why don't you go ahead? I think we'll be okay. I'm happy to send my middle kid to your office to fix that, but I think his billing rate might exceed yours. Sure, yes. All right. To continue, the Illinois Workers' Compensation Act operates to make the benefits under the act the exclusive remedy for an employee who is injured while acting in the course of his or her employment. In return, the employee enjoys the benefits of liability without proving fault. This can be found in Sections 5A and 11 of the act. Once an employer asserts that an employee's claim is precluded under the exclusive remedy provision of the act, the burden shifts to the employee to establish that his or her claim falls into one of the four exceptions to the general rule. These exceptions include, one, injury was not accidental, two, that the injury did not arise from his or her employment, three, that the injury is not received during the course of his or her employment, or four, that the injury is not compensable under the act. Plamp argues here that the first, second, and fourth exceptions apply. However, I will explain why each exception fails to apply. When looking at the first exception, the Illinois Supreme Court in Mirabry v. Marshall's field provides guidance here as to whether an injury was accidental. In that case, the court explains, injuries inflicted intentionally upon an employee by a co-employee are accidental within the meaning of the act, and such injuries are unexpected and unforeseeable from the injured employee's point of view. Ms. Coyle, to kind of streamline things here, do you disagree with Mr. Riesveld that the record supports an argument that his father was aware that he had some propensity for  I would disagree. There's absolutely no evidence that he had propensity for violence, and the deposition testimony of the plaintiff himself said that he never feared from Thomas Clarizio. They just knew each other in the workplace. There was never instances where they got into physical altercations. So I would disagree that there was any evidence that Thomas Clarizio had propensity for violence. Okay, Flower Shop doesn't ring any bells for you. There was an incident with the Flower Shop, however, that was an isolated incident. I don't think that that gives rise to the fact that he is somehow some horribly violent person. Also, there was mention of an incident with the brothers having a scuffler incident with another. Again, I don't think that that gives rise to a question of whether he was violent. I don't think that evidence supports that. That's anything that should have been known or told to Camille that he should know that he has these violent propensities because of these two incidents. How about schizophrenia? It's a unique and certainly a very complicated and oftentimes, when it meets the judicial system, there are some dire consequences. What about that? Sure. So from my recollection of the record, I didn't believe that the schizophrenia was diagnosed until after this incident. I know he was admitted for mental health issues, but I don't believe specifically diagnosis of schizophrenia was made. How about the fact that he was hospitalized? Sure, he definitely was struggling with mental health issues, but not to the extent of  I don't want to put words in Mr. Roosevelt's mouth, but I think he's arguing that the fact that he was hospitalized puts your client on notice that he could be dangerous. I wouldn't necessarily make that jump. Just because someone has issues of mental health doesn't mean that they are a danger to others, maybe to themselves. Although, I don't think that there was any evidence that he was a danger to himself. I think he just had mental health issues. And also, the fact that the argument that Robert Kleser exposed the plaintiff to this potentially dangerous employee doesn't rise to the level of intent that would be required to circumvent the act. So to that point, if he was having mental health issues, it's not the kind of conduct on Bob Albright's behalf that would circumvent the act and strip the protections of the act from Bob Albright. So that leads me into the first exception that we look at whether or not an injury was  So continuing on, injuries are accidental from an employer's point of view, or at least the employer did not direct or expressly authorize the home employee to commit the assault. Injuries intentionally inflicted by a co-worker are accidental from the employer's point of view, and the employer has the right to consider the injured employee's sole remedy against the employer will be under the act. The First District Appellate case Rodriguez also stated, LNA law is clear that unless an employer has committed or expressly authorized a co-employee to commit an intentional tort against the employee, the act prohibits common law action seeking damages from such torts. So here the relevant inquiry under the first exception is whether there's any evidence that the employer committed or directed or expressly authorized the employee to commit an intentional tort against another employee. And here there's no evidence that Robert Floresio, Director, expressly authorized Thomas Floresio to strike the plaintiff. Plaintiff argues the contrary, that it should be viewed as intentional and thereby circumvent the act because defendant intentionally negligently concealed information from the plaintiff regarding the dangers of the co-employee's mental instability or may express implied representations to plaintiff that working with Thomas is perfectly safe with the intent that plaintiff will rely upon those representations. However, this alleged conduct does not give rise to the level of specific intent required to escape the exclusivity provisions of the act. In order to circumvent the act, plaintiff here must show that Bob Albright specifically intended to injure the plaintiff. It is not enough that Bob Albright exposed the plaintiff to dangers that led to his injury, in other words, allowed him to work with Thomas Floresio. A similar argument was made and rejected in the first district case. Justin Pettel, are you asking a question? I'm sorry, the wonders of Zoom. I've got a truck outside of my office here. Can you hear me okay? I can hear you. I saw your mouth moving, but I couldn't hear you. So, it sounds like you're arguing it's got to be intent, specific intent, as opposed to, let's say, a reckless standard. I know I'm confusing criminal terms when I say that, but do you understand what I'm saying here? If he knows that it's on its propensity for violence, isn't that enough? If he had, you'd have to know with 100% certainty, essentially, that exposing him to this, the plaintiff to this workplace with Thomas, it would certainly cause harm. That's the standard we're at for the first exception, and that was laid out in Garland versus Morgan Stanley. And I think that case is a great example when applied to this case, because the plaintiff here is trying to say, well, let's loosen that standard, just say that you intend to expose him. And the first district said, that's not enough. They reiterated, for an employee seeking to bypass the exclusive remedy of the act, the employee must show the employer specifically intended to injure the plaintiff. And there just simply isn't that evidence here in this matter. Thank you. You've answered my question. So, with respect to the first exception, plaintiff relies upon Handley versus Anarco and Daniel versus Ventra. However, these cases do not support reversal in this matter. Both of those cases looked at whether dismissal of plaintiff employees' complaints were proper pursuant to motions to dismiss. In reversing trial court decisions in those matters, the appellate courts noted that the pleading stage, there were sufficient allegations of specific intent to harm to survive dismissal. Here, the trial court had the benefit of reviewing all the evidence in this matter, all the deposition testimony, and finding that Bob Albright did not specifically intend to harm the plaintiff. Throughout his brief, plaintiff also asserts questions of fact remain regarding theories of principal agent liability. However, he doesn't really expound on those arguments. He doesn't really apply any case law to support that. These arguments are inapplicable and don't support reversal in this matter. Because here, plaintiff has failed to show that Robert Clarizio specifically intended for the plaintiff to be harmed, he has failed to establish the first exception applies. With regard to the second exception, the first district case, Price v. Lunen-Roberts, provides guidance on this issue. The court in Price explained that an injury arises from employment when a causal connection exists between working conditions and the resulting injury. Fights among employees are believed to be risks and tendental to employment, where the disputes concern the employer's work. However, where disputes are purely personal in nature, courts have found such instances do not arise out of the employment. In Price, we had two workers at an Arby's restaurant. One of the employees was stabbed to death with a kitchen knife by the other. During the investigation, the employee stated he believed he was ill, sick in the head, that there had been some issue building up, the decedent knew what he did and needed to be dealt with. The decedent tried to do something to him and started yelling. The decedent had done this before and he was sick of it. And now, despite a thorough investigation in the criminal matter and the civil matter, significant discovery, there was no evidence of a personal dispute or motive for the incident. Trial court ultimately granted summary judgment for the employer. Finding that there was no evidence that the attack was the result of a purely personal dispute. In affirming the trial court, the appellate court noted, quote, while there's no evidence that the dispute was work-related, there is similarly no evidence that the dispute was personal and plaintiff has the burden of proving, producing evidence the dispute was personal. Plaintiff does not point to any actual evidence of a personal dispute between Price and Thomas that existed at the time of the attack or served as a motivation for the attack. The facts of this case are strikingly similar to ours. In both cases, it was a workplace incident among co-workers that resulted in injury. The employee and Price told the police that he was ill, sick in the head, and there was no evidence of motive or personal dispute. Here, Thomas Clarido testified that the incident was a result of his struggles with mental illness. And he also testified the plaintiff did not do anything to incite his actions that day. It's also worth pointing out that the plaintiff testified in his deposition that Thomas's behavior was not out of the ordinary that day, that they had worked together for at least four years prior to this incident. He never felt unsafe working with Thomas, and Thomas had never made any threats of violence against him. Also, they did not have any sort of personal relationship outside of the workplace. This evidence further lends to the argument that this incident did not arise out of a personal dispute. The plaintiff cites to Martinez v. Guttman-Leather to argue that our incident arose out of a purely personal dispute. However, facts of Martinez are materially different, and its holding is not instructive here. In Martinez, we know that an employee of Guttman-Leather was shot and killed by a co-worker. In that matter, the decedent's wife produced an affidavit and attested that she lived with the decedent prior to his death, had personal knowledge of a quarrel between him and Mr. Hernandez, had been deteriorating for some time, and had nothing to do with the decedent's employment at Guttman-Leather, but over a period of at least a year prior to the incident, Mr. Hernandez had come to her home looking for the decedent and threatened to cause harm. In finding there was sufficient evidence of a purely personal dispute, the appellate court relied upon the specific evidence of this affidavit in making their finding. Here, there is no such specific evidence to support a finding the incident arose out of a purely personal dispute. We know that there is no evidence that Thomas had ever threatened harm or violence to the plaintiff, or that they had a relationship outside of work. Thus, the trial court properly found that Martinez was distinguishable to our case. Plaintiff also makes issue with some of the statements that Thomas made in the police report. However, taking a closer look at this testimony as a whole, its evidence that his actions and statements that day were a result of a break in his mental health, not because of some sort of dispute that had been building before this incident. In fact, or again, this case is factually similar to Price in that the incident was simply a result of a break in mental health and was not a result of a purely personal dispute. Because the plaintiff has failed to establish the incident arose out of a purely personal dispute, the second exception does not apply. With regard to the fourth exception, plaintiff argues his claims were not compensable under the act, and in support, he states that none of his bills were paid by comp. However, plaintiff failed to go as far as to say that his bills were submitted and denied or because they were not submitted in the first place. In fact, in his deposition, plaintiff testified he was advised not to make a comp claim. So without more evidence, we can't say that the fourth exception would apply to take you outside of the exclusive remedy provision of the act. Here, the circuit court properly found the plaintiff's claims were barred by the exclusive remedy provision of the Illinois Workers' Compensation Act and properly granted summary judgment for defendant as to counts one through three of the complaint. The reasons discussed and for the reasons set forth in a brief defendant, Kapoli Hobbs Albright elected respectfully request that this court affirm the circuit court's order granting summary judgment as to counts one through three of the complaint. Thank you. It was good timing, Ms. Coyle, right at the end of your allotted time. Justice Anderson, I don't have any other questions. Do you have any others? I do not. All right. Thank you, Ms. Coyle. Mr. Roosevelt, were you able to find those sites? I was, Your Honor. If you look to the record, it's first page A-25 of the appendix is deposition testimony of Camille Cordes, who had talked about heated arguments he had had in the past with Thomas. The fact that he had had verbal altercations had had to send him home from job sites. But then he was asked specifically about violent tendencies. And he said that he was aware of an incident that took place where the Elgin police had to be called because Thomas had gotten into a physical altercation with his brother, Bobby. And Bobby had told Camille of those details that they had to get the police involved because there was a violent altercation. Additionally, if we look to A-123 is the discussion of the flower shop that we're talking about. And it goes on for several pages. It's Robert's deposition where he talks specifically about that incident and that altercation and what knowledge he had of it. Thank you. Yeah. Unless you've got other sites, I'm going to go back to mute here. I don't. No. I think those are the two that I was referencing that I didn't have earlier. Thank you. And then any other rebuttal that you have? Certainly. Really, what we're talking about is foreseeability, not certainty. The employer doesn't have to have certainty that the bomb is going to go off. They need to have the foreseeability that there's a bomb in the building. And that's really what we're talking about. We're not talking about Bob's Electric knowing with 100% certainty that their employee is going to try to murder someone. What we're talking about here is that the employer knows that a serious injury and risk is foreseeable, not certain. So I don't have to prove or no one has to prove that the employer knew with 100% certainty that is a practical impossibility. But what we're talking about here is if all the ingredients are in the mix and are right, and Camille doesn't know that one of the ingredients could possibly kill him because he's allergic to it, he shouldn't eat the thing that they're making. Similarly, if he's at work and one of the people he's working with is dangerous and has had altercations with him in the past and has had to have the police called on him because he has gotten physically violent with somebody else and because he has had physical altercations or verbal altercations with clients and he's been involuntarily hospitalized multiple times, that is something that the employer is aware of. Camille should be told of this danger. And the fact that he's not warned, he's not told is exactly the same scenario that occurred in Daniels and occurred in Handley. It's not about whether or not a certain injury is going to occur. For instance, I keep going back to Daniels with the asbestos cases. Inhalation of asbestos does not mean you're going to get cancer. And exposure to asbestos does not mean you're going to get cancer. And there are certainly people who have worked with and have used asbestos who don't get cancer. Similarly, Mr. Cordes had worked with Thomas on several occasions and not been hurt. That doesn't mean that the danger is zero or that the danger is gone. It just means that he didn't get hurt that time. It means he got lucky. It doesn't mean that there wasn't a reasonable foreseeability of danger. And the person that has the knowledge is the person that could have prevented it and chose not to, presumably because they're seeking to protect their child. And I understand that. But that does not relieve them of their duty to protect their employees. As it pertains to a personal dispute, I go back to the record I cited a moment ago where Camille had had to tell Thomas on multiple occasions to leave job sites, particularly because Thomas had told him, my dad owns the company. I don't have to do what you tell me. And I'm not going to. And he was insubordinate and argumentative and wouldn't do what he was told. And when he was told to do things, he would get angry and he would argue and he would try to shout Camille down and wouldn't be cooperative. And then when you get to the police report, if you want to blame it on a mental break or the throes of schizophrenia, I think we go back to the initial point, which is the only person that knows that he's violently mentally ill is his father, who owns the company. Camille doesn't know that. But even if it's not the throes of schizophrenia, which there's no evidence, there's no expert testimony, there's nothing in the record that says that at the time he was having a schizophrenic episode when he was speaking to the police. And I don't want to get sidetracked, but it's important to remember that when he's speaking to the police, it's days later because Thomas ran. He fled the state and he had to be extradited back from Wisconsin to Illinois. And so it wasn't that he attacked Camille and then moments later, the police arrived and took him into custody. They had to find him and they had to bring him in. And then they questioned him days later. And when they questioned him, he said to the police that he wished that he had killed Camille. That is a personal dispute. That has nothing to do with it. You're going to have to wrap it up here. Your time has run out. I don't have any further questions. Justice Anderson. I do not. All right. We are going to, as we said before, council conference with Justice Bertani after he's had an opportunity to listen to these arguments and issue a disposition in due course.